# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIVIL ACTION |
| *ex rel.* GARY CRESSMAN | : | |
| *Plaintiff/Relator* | : | |
| | : | NO. 13-5693 |
| v. | : | |
| | : | |
| SOLID WASTE SERVICES, INC., | : | |
| t/d/b/a J.P. Mascaro & Sons | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                 APRIL 6, 2018

# MEMORANDUM OPINION

## INTRODUCTION

Plaintiff/Relator Gary Cressman ("Plaintiff" or "Relator") brought this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§3729-3733, against his former employer, Defendant Solid Waste Services, Inc., t/d/b/a J.P. Mascaro & Sons ("Defendant"), alleging that Defendant submitted false claims for payment to various federal governmental agencies with which it had service contracts, without disclosing an alleged violation of various environmental laws arising out of a February 25, 2013 incident at Defendant's Souderton Division transfer station. Before this Court are fully briefed cross-motions for summary judgment filed by the parties, in which each party seeks judgment in its favor. For the reasons stated herein, Defendant's motion is granted, and Plaintiff's motion is denied. Accordingly, summary judgment is entered in favor of Defendant.

**BACKGROUND**

Plaintiff filed a *qui tam* action[1] against Defendant, alleging a violation of the FCA, 31 U.S.C. §3729 *et seq.*, by Defendant in connection with an environmental regulatory violation by two of Defendant's former employees at Defendant's state-permitted waste transfer station in Souderton, Pennsylvania. This matter was originally filed under seal as a *qui tam* action to allow the United States Government (*i.e.*, the Department of Justice) time to decide whether to intervene on behalf of Plaintiff. On March 23, 2015, the Government advised that it had elected to not intervene. Discovery ensued and was completed.

On November 28, 2017, the parties filed the underlying cross-motions for summary judgment. When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). As noted, the parties have filed cross-motions for summary judgment. Because this Court ultimately concludes that Defendant is entitled to summary judgment, this Court has construed all facts and evidence in the light most favorable to Plaintiff. These relevant facts are summarized as follows:[2]

---

[1] "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000). A private person, called a *qui tam* relator, brings an action "'for the person and for the United States Government against the alleged false claimant, 'in the name of the Government.'" *Id.* at 769 (quoting 31 U.S.C. §3730(b)(1)).

[2] Most of these facts are taken from the parties' respective statements of facts and/or responses thereto. This Court notes that in responding to Defendant's statement of undisputed facts, Plaintiff baldly asserts that some facts are "disputed," but fails to cite to record evidence to support the purported dispute. Defendant's statement of undisputed facts, on the other hand, is supported with citations to the evidentiary record. Notwithstanding, while most of the facts material to the parties' cross-motions are undisputed, where disputed, this Court has construed the facts in favor of Plaintiff.

Plaintiff Gary Cressman was an employee of Defendant Solid Waste Services, Inc., working at Defendant's Souderton, Pennsylvania facility. (Def.'s Statement of Undisputed Material Facts ("SOF"), at ¶4). Defendant is a privately-held corporation that provides integrated solid waste services to the public, including the collection, transportation, disposal and recycling of residential, commercial, industrial and municipal non-hazardous solid waste. (*Id.* at ¶5). Defendant has several separate trash collection and hauling divisions in Pennsylvania from which trucks are dispatched to collect trash from customers. (*Id.* at ¶6). Defendant's trash collection and hauling divisions are the Souderton Division, in Souderton, Pennsylvania; the Allentown Division, in Allentown, Pennsylvania; the Berks Division, in Exeter Township, Pennsylvania; the Nanticoke Division, near Wilkes-Barre, Pennsylvania; and the Bridgeport Division, in Bridgeport, Pennsylvania. (*Id.* at ¶7).

As Defendant's Director of Operations, Michael Mascaro supervised the general managers at each of Defendant's trash collection and hauling divisions from 2005 until the beginning of 2016, when he became the Vice President of Operations. (*Id.* at ¶9). Sonny Macelak was the General Manager of Defendant's Souderton Division, and Mark Bowe was the Shop Foreman/Operations Manager of that division, until they were fired by Mr. Mascaro on February 28, 2013, for a regulatory violation at the Pennsylvania Department of Environmental Protection ("DEP")-permitted waste transfer station located at Defendant's Souderton Division property. (*Id.* at ¶10).

The waste transfer station at Defendant's Souderton Division property is permitted and regulated by the Pennsylvania DEP. (*Id.* at ¶12). There are no waste transfer stations at Defendant's Berks, Allentown, and Nanticoke Division properties. (*Id.* at ¶13). The operation of the transfer station at the Souderton Division property generates leachate, which is water/liquid that passes through or is generated by trash at a solid waste facility such as a transfer station or landfill. (*Id.* at ¶20). The collection and treatment of leachate is a regulatory requirement of DEP-permitted solid waste facilities. (*Id.* at ¶21). The leachate generated at Defendant's Souderton Division transfer station is collected onsite at the transfer station and transported offsite for treatment at a publicly-owned wastewater treatment plant. (*Id.* at ¶22).

In February 2011, Plaintiff was hired to work out of Defendant's Souderton Division as a roll-off truck driver. (*Id.* at ¶24). Plaintiff performed trash collection services as a roll-off truck driver until the end of May 2012, when he suffered a work-related injury. (*Id.* at ¶25). On February 25, 2013, while performing modified work duties because of an earlier work-related injury, Plaintiff observed a regulatory violation by two employees at Defendant's Souderton Division transfer station. (*Id.* at ¶26). Specifically, Plaintiff observed Sonny Macelak and Mark Bowe discharge some transfer station leachate onto a grassy area of the Souderton Division property (the "February 25, 2013 Discharge

Incident/Violation"). (*Id*. at ¶27). Plaintiff photographed the incident on his cell phone. (*Id*. at ¶28).

Plaintiff first reported his observations of the leachate discharge to Pennsylvania DEP representatives on February 25, 2013. (Pltf.'s Resp. to SOF, at ¶29). Plaintiff provided the DEP representatives his name and e-mailed pictures of the discharge that he had taken with his cell phone. (*Id*.). Plaintiff asked that the initial report be treated with anonymity. (*Id*.). On February 26, 2013, DEP representatives made a site visit to the Souderton Division property. (*Id*.). Plaintiff intentionally did not go to work that day. (*Id*.). The DEP representatives inspected the site and interviewed Mr. Macelak and Mr. Bowe about the discharge. (*Id*.).

On February 27, 2013, Plaintiff returned to work, and became aware of the statements and representations made by Mr. Macelak and Mr. Bowe to the DEP representatives. (*Id*.). Plaintiff advised Mr. Mascaro that the statements made by Mr. Macelak and Mr. Bowe were not consistent with his own observations. (*Id*.). Plaintiff was then summoned to a meeting in Defendant's corporate office. (*Id*.). This meeting included some of Defendant's corporate officers and legal counsel. (*Id*.). Plaintiff repeated his observations and advised Defendant that he would so advise any lawful authority of his personal observations. (*Id*.).

Sometime after the meeting, but on that same day, Joseph P. Mascaro, III, prepared a memorandum setting forth what Plaintiff had conveyed and what actions Defendant would be taking in response, including notifying the DEP of the discharge incident, mitigating any potential impact, and terminating the two employees. (SOF at ¶32). Defendant also called the DEP to request a meeting for purposes of reporting the incident. (*Id*. at ¶33). On February 28, 2013, Defendant met with DEP representatives regarding the discharge incident and provided the DEP a letter report detailing Defendant's investigation of the incident, including Defendant's interview of Plaintiff. (*Id*. at ¶¶35-36). Defendant also terminated the employment of Mr. Macelak and Mr. Bowe that day. (*Id*. at ¶34).

In a March 20, 2013 Souderton Transfer Station Inspection Report, the DEP noted that the violations related to the leachate discharge incident had been corrected. (*Id*. at ¶37). By letter dated June 17, 2013, the DEP, in lieu of a formal administrative proceeding to assess a civil penalty, proposed a "Consent Assessment of Civil Penalty" to Defendant for the improper discharge incident. (*Id*. at ¶38). On September 13, 2013, Defendant executed a "Consent Assessment of Civil Penalty" with the DEP, which obligated Defendant to pay a civil penalty of $37,000 for the improper leachate discharge incident. (*Id*. at ¶39). Seventeen days later, on September 30, 2013, Plaintiff filed his underlying *qui tam* complaint.

Defendant does business with the United States government pursuant to several contracts. (*Id*. at ¶52). Specifically, at various times between 2008 and

June 30, 2014, Defendant's various divisions performed trash collection services for several federal agencies (the "Federal Agencies"), which included: six different United States Post Offices; Social Security Administration offices in Wilkes-Barre; Department of Veterans Affairs offices in Wilke-Barre; the federal correctional institution in Waymart; and offices of the Department of Military and Veterans Affairs, the Drug Enforcement Agency, and the Department of Homeland Security. (*Id*. at ¶¶52-68). Ninety-eight percent (98%) of the dollar value of the waste collection services provided by Defendant for the Federal Agencies between 2008 and June 30, 2014, was performed by Defendant's Nanticoke Division in Wilkes-Barre, with all of that waste being disposed of at the Keystone Landfill in Dunmore/Scranton, Pennsylvania. (*Id*. at ¶¶53, 61-66). None of the waste collected from any of these Federal Agencies was taken to the waste transfer station on the Souderton Division property. (*Id*.). Rather, all waste collected by Defendant from these Federal Agencies was transported directly to landfills and/or disposal facilities unaffiliated with Defendant, such as the Keystone Landfill in Dunmore/Scranton, and the Pioneer Crossing Landfill in Birdsboro, Pennsylvania. (*Id*.).

**LEGAL STANDARD**

Federal Rule of Civil Procedure ("Rule") 56 governs the summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Generally, Rule 56(c) provides that the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has

"fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id*. at 322. After the moving party has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." *See* Rule 56(c)(1)(A-B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The nonmoving party may not rely on bare assertions, conclusory allegations or suspicions, *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings. *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*.

The standards to be applied in deciding cross-motions for summary judgment are the same as those applied when only one party has filed a summary judgment motion. *Cincinnati Ins. Co. v. Devon Intern., Inc.,* 924 F. Supp. 2d 587, 589 n.3 (E.D. Pa. 2013). "When confronted with cross-motions for summary judgment, the 'court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Anderson v. Franklin Institute*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quotations omitted).

**DISCUSSION**

As described more fully below, Plaintiff brings his FCA claims under an implied false certification theory of liability. Generally, under this theory of liability, an entity is liable for falsely representing itself as having complied with applicable regulations in connection with its submission of a claim or invoice for payment from federal funds. In this matter, Plaintiff essentially contends that Defendant's compliance with all federal environmental public safety laws is an express or implied condition of Defendant's waste removal service contracts with the Government. As such, Plaintiff argues that Defendant violated the FCA by submitting invoices to the Federal Agencies for payment without disclosing its violation of various environmental laws/regulations arising out of the February 25, 2013 Discharge Incident/Violation. As set forth below, however, Plaintiff overstates the scope of existing law with respect to claims under the FCA, particularly with respect to the materiality requirement for any such claim.

The FCA's *qui tam* provision permits a private person (known as a "relator") to bring a civil action on behalf of the United States against any individual or company who has knowingly presented a false or fraudulent claim for payment to the United States. 31 U.S.C. §3730(b).[3] The FCA imposes liability upon a person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval, or who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. *Id*. at §3729(a)(1)(A)-(B). The FCA defines the term "knowingly" as when a defendant "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

---

[3] The FCA encourages insiders to disclose fraud by awarding successful *qui tam* plaintiffs a portion of any judgment, plus reasonable attorneys' fees and costs. *Id*. at §3730(d).

information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id*. at §3729(b).

There are two categories of false claims under the FCA: a factually false claim and a legally false claim. *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 94 (3d Cir. 2018); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011); *United States ex rel. Bergman v. Abbot Laboratories*, 995 F. Supp. 2d 357, 366 (E.D. Pa. 2014). A claim is factually false when the claimant misrepresents what goods or services it provided to the United States Government. *Wilkins*, 659 F.3d at 305. Here, Plaintiff does not allege a factually false claim, but rather asserts only a legally false claim.[4]

A claim is legally false when a claimant knowingly, falsely certifies that it has complied with a statute or regulation, the compliance with which is a condition or precondition for government payment. *Id*.; *see also United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017). A legally false FCA claim is based on a "false certification theory of liability." *Wilkins*, 659 F.3d at 305. Within the false certification theory of liability, there are two further categories of FCA claims: express and implied false certification. *Id*. Plaintiff's FCA claim is premised on the "implied false certification theory of liability."[5]

Under the implied false certification theory, a plaintiff must establish that the defendant has knowingly made a false claim for payment of federal funds from a federal agency without disclosing that it is in violation of a regulation or law that affects its eligibility for payment and

---

[4] Specifically, there is no paragraph in Plaintiff's complaint that avers that Defendant misrepresented any of the trash collection services it provided the various federal agencies it served. Indeed, it is undisputed that Defendant performed all of the trash collection services for which it billed the federal agencies and that it billed those federal agencies the agreed upon amounts for those services.

[5] Plaintiff seeks relief based solely upon an implied false certification theory of liability. (*See* Complaint, ECF 1 at ¶26).

that is a precondition for payment by the government. *Id*. Under this theory, a plaintiff must show that if the Government had been aware of the defendant's violation of the laws or regulations that are the bases of the plaintiff's FCA claims, the Government would not have paid the defendant's claims. *Id*. at 307. "Absent this requirement, the FCA could turn 'into a blunt instrument to enforce compliance with all . . . regulations' rather than 'only those regulations that are a precondition to payment.'" *Id*. (quoting *Rodriquez v. Our Lady of Lourdes Medical Center*, 552 F.3d 297, 304 (3d Cir. 2009).

In 2016, the United States Supreme Court further delineated the requirements for a FCA claim premised on the implied false certification theory of liability:

> Accordingly, we hold that the implied [false] certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory or contractual requirements makes those representations misleading half-truths.

*Universal Health Services, Inc. v. United States ex rel. Escobar*, -- U.S. --, 136 S. Ct. 1989, 2001 (2016). The *Universal Health* Court confirmed that "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement ***must be material*** to the Government's payment decision in order to be actionable under the False Claims Act." *Id*. at 1996, 2002 (emphasis added). The *Universal Health* Court described the materiality requirement as being "demanding" and "rigorous," and explained that a material misrepresentation is one that goes "to the very essence of the bargain." *Id*. at 2002-03; *see also United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 760 (3d Cir. 2017) (confirming that "materiality is an essential element of a False claims Act violation . . . ."); *Petratos*, 855 F.3d at 489. The Supreme Court described the materiality requirement as follows:

9

> The materiality standard is demanding. The False Claims Act is not "an all-purpose antifraud statute," or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.
>
> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Universal Health*, 136 S.Ct. at 2003-04 (citations omitted). Relying on *Universal Health*, the United States Court of Appeals for the Third Circuit reiterated the materiality requirement:

> Where, as here, a plaintiff contends a defendant's claim is legally false, he or she must also prove the defendant's misrepresentation about its compliance with a legal requirement is "material to the Government's payment decision." "[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."

*Greenfield*, 880 F.3d at 94 (quoting *Universal Health*, 136 S. Ct. at 1996, 2003).

Defendant moves for summary judgment on the basis that Plaintiff has failed to make an evidentiary showing sufficient to establish the existence of elements necessary to his FCA cause

of action based on an implied false certification theory of liability. In particular, Defendant argues that Plaintiff has not shown, and cannot show, that Defendant's alleged failure to disclose the February 25, 2013 Discharge Incident/Violation when it submitted invoices to the Federal Agencies for waste removal services it performed for those Federal Agencies was material to Defendant's right to payment from those Federal Agencies. Defendant argues that the violation was, in fact, not connected in any way to the waste disposal services it was contracted to and did perform for the Federal Agencies. In response, Plaintiff argues that he has met his evidentiary burden on all elements of his claim, and is, therefore, entitled to summary judgment in his favor. This Court agrees with Defendant.

As set forth above, Defendant essentially provides two types of services through its five divisions: (1) it picks up and transports solid waste to various landfills for disposal; and (2) it runs a "transfer" station at its Souderton Division, at which it temporarily stores certain types of waste to be disposed of at particular facilities. With respect to its service contracts with the Federal Agencies, Defendant merely picked up trash and immediately transported it to various nearby landfills, and not its Souderton Division transfer station where the February 25, 2013 Discharge Incident/Violation occurred. Indeed, most of the federal agency trash pickup (98.7%) was performed by Defendant's Nanticoke Division, and not its Souderton Division. Regardless, Defendant was not contracted to provide, nor did it ever transport the trash that it picked up from the Federal Agencies to its Souderton Division transfer station. Under these undisputed facts, Defendant's February 25, 2013 Discharge Incident/Violation at the Souderton Division transfer station was not remotely related to Defendant's service contracts with the Federal Agencies to substantiate a FCA claim under Plaintiff's posited theory of recovery.

In addition, to meet the materiality requirement for his FCA claims, Plaintiff must present evidence that the Federal Agencies for whom Defendant performed waste pickup services would not have paid Defendant's claims had they known of the February 25, 2013 Discharge Incident/Violation at Defendant's Souderton Division transfer station. *See Universal Health*, 136 S. Ct. at 1996; *Petratos*, 855 F.3d at 490. Plaintiff has presented no such evidence. To the contrary, record evidence demonstrates that the Federal Agencies did not deem the February 25, 2013 Discharge Incident/Violation material to their payment of the submitted invoices. For example, record evidence shows that the government agencies to whom Plaintiff has submitted invoices for payment since the February 25, 2013 Discharge Incident/Violation[6] have continued to pay Defendant for the waste pickup services performed even after Plaintiff filed the underlying suit and after the Department of Justice investigated the allegations contained in Plaintiff's complaint and declined to intervene on behalf of the Federal Agencies. Here, in the four years since learning of Plaintiff's allegations in this matter, including the regulatory violations asserted and relied upon by Plaintiff, the Department of Justice has not initiated any proceedings or taken any action against Defendant. Significantly, after investigating Plaintiff's underlying FCA claims, the Department of Justice declined to intervene and prosecute Plaintiff's suit in the name of and on behalf of the United States Government. As in *Petratos*, the Department of Justice's declination to intervene or take any action against Defendant supports the conclusion that it does not consider the regulatory violation or failure to disclose asserted by Plaintiff to be "material" to the waste collection services that Defendant performed and performs

---

[6] Notably, it goes without saying that under the implied false certification theory of liability on which Plaintiff solely relies, Plaintiff cannot sustain any FCA claims premised on invoices that Defendant submitted to the Federal Agencies prior to the February 25, 2013 Discharge Incident/Violation. Plaintiff's claim, therefore, must be limited to those invoices that Defendant submitted to the Federal Agencies after the February 25, 2013 Discharge Incident/Violation.

for the Federal Agencies. It is the Department of Justice that represents the United States Government (*i.e.*, the Federal Agencies) and, as the Third Circuit noted in *Petratos*, "[b]ecause the False Claims Act was passed to protect the Federal Treasury . . . it is the government's materiality decision that ultimately matters." *Petratos*, 855 F.3d at 492. This unrefuted evidence shows that the alleged misrepresentations, *i.e.*, failure to disclose the February 25, 2013 Discharge Incident/Violation, were not material. *Universal Health*, 136 S. Ct. at 2003 (holding that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."); *Petratos*, 855 F.3d at 490 (noting in decision affirming dismissal of FCA claims on materiality grounds that in the six years since the relator disclosed evidence of the defendants' misinformation to the government, "the Department of Justice has taken no action against [the defendants] and declined to intervene in this suit."). As such, Plaintiff has not met his summary judgment burden on materiality, an element essential to his claims.

In addition, to meet the materiality requirement for FCA liability, a misrepresentation about a regulatory violation must go "to the very essence of the bargain." *Petratos*, 855 F.3d at 489. The "essence of the bargain" between Defendant and the Federal Agencies was that Defendant would collect, transport and dispose of waste picked up from those Federal Agencies. There is no dispute that Defendant performed these services. Moreover, as noted, the uncontradicted evidence shows that none of the waste picked up by Defendant from the Federal Agencies was ever transported to or stored in Defendant's Souderton Division transfer station, where the alleged regulatory infraction occurred. Rather, the waste was transported to and disposed of at nearby landfills. As such, there is simply no connection or nexus between the regulatory violation at the transfer station and the waste collection Defendant performed for the

Federal Agencies, particularly since none of the Federal Agencies' waste ever went to the Souderton Division transfer station. Under these undisputed facts, Plaintiff's FCA claims fail.

Plaintiff relies on the Third Circuit's decision in *New Castle County v. Hartford Accident & Indem. Co.*, 970 F.2d 1267 (3d Cir. 1992) to argue that the discharge of leachate, which occurred at Defendant's Souderton Division transfer station, goes to the "heart of the bargain" between Defendant and the Federal Agencies to remove solid waste from the Federal Agencies' facilities. Plaintiff contends the *New Castle* decision is "significant as concerns materiality." The *New Castle* decision, however, was decided nearly twenty-four years before the Supreme Court's seminal materiality decision in *Universal Health*. Moreover, the *New Castle* decision (an insurance coverage matter) does not involve any claims under the FCA and is silent with respect to the issue of materiality. As such, this Court fails to find any significance or relevance in the *New Castle* decision to this case.

Lastly, in a bald attempt to meet his summary judgment burden with respect to materiality, Plaintiff also relies on the opinion of his purported expert, Patrick Malyszek, J.D., that the incident was material. Apart from making a mere reference to the report of Mr. Malyszek, which Plaintiff attached as an exhibit to his own motion for summary judgment, Plaintiff provides no substantive analysis or record evidence to show materiality, an element for which Plaintiff bears the burden of proof. Moreover, Mr. Malyszek's report is a legal opinion, which relies primarily on inapposite case law and apparent administrative decisions from jurisdictions outside of the Third Circuit. It is axiomatic that "an expert witness is prohibited from rendering a legal opinion" and a district court must "ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217

(3d Cir. 2006). Regardless, Mr. Malyszek's report does not in any way assist Plaintiff in meeting his summary judgment burden.

**CONCLUSION**

For the reasons stated herein, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied. Accordingly, judgment is entered in favor of Defendant. An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.